# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| BRIENA CRITTENDEN, as Personal Representative of the ESTATE OF JOSHUA P. CRITTENDEN,<br><br>      Plaintiff,<br><br>v.<br><br>1.  CITY OF TAHLEQUAH, a municipality in Cherokee County, Oklahoma,<br>2.  RANDY TANNER, a police officer for the City of Tahlequah,<br>3.  BRONSON MCNIEL, a police officer for the City of Tahlequah,<br>4.  SHANNON BUHL, a Cherokee Nation Marshal, and<br>5.  REED FELTS, a police officer for the City of Tahlequah,<br><br>      Defendants. | Case No. CIV-17-106-RAW |

## ORDER[1]

Plaintiff filed her Complaint on March 24, 2017, bringing claims arising from an officer-involved shooting on June 27, 2015 which resulted in the death of Plaintiff's decedent, Joshua Crittenden ("Josh"). Now before the court are motions for summary judgment filed by the City of Tahlequah (the "City") [Docket No 60], Randy Tanner [Docket No. 58], Bronson McNiel [Docket No. 59], Shannon Buhl [Docket No. 61], and Reed Felts [Docket No. 62] and Plaintiff's motion for sanctions for spoliation of evidence [Docket No. 64].[2]

---

[1]     For clarity and consistency herein, when the court cites to the record, it uses the pagination assigned by CM/ECF.

[2]     Also pending is Defendants' motion in limine [Docket No. 63]. Should this action go to trial, the court will address this motion at the pretrial conference.

Plaintiff's claims are as follows:

- Count I – § 1983 claims for excessive force in violation of the Fourth Amendment against Officer Tanner, Officer McNiel and the City;

- Count II – § 1983 claims for failure to provide medical care in violation of the Fourteenth Amendment against all Defendants;

- Count III – Oklahoma Governmental Tort Claims Act ("OGTCA") claim for assault and battery against the City;

- Count IV – OGTCA claim for negligent use of excessive force against the City; and

- Count V – OGTCA claim for negligent failure to provide medical assistance against the City.

Plaintiff also requests punitive damages.

## I.     STANDARD OF REVIEW

The court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In applying the summary judgment standard, the court views the evidence and draws reasonable inferences therefrom in the light most favorable to the nonmoving party. *Burke v. Utah Transit Auth. & Local 382*, 462 F.3d 1253, 1258 (10th Cir. 2006). At this stage, however, Plaintiffs may not rely on mere allegations, but must have set forth, by affidavit or other evidence, specific facts in support of their Amended Complaint. *Id.*

"Conclusory allegations that are unsubstantiated do not create an issue of fact and are insufficient to oppose summary judgment." *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1136 (10th Cir. 2003) (citation omitted).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

"[A]ffidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient." *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991). The court disregards "inadmissible hearsay statements *contained* in affidavits, as those statements could not be presented at trial in any form." *Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (emphasis in original). Similarly, "[t]estimony which is grounded on speculation does not suffice to create a genuine issue of material fact to withstand summary judgment." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 876 (10th Cir. 2004).

"A movant is not always required to come forward with affidavits or other evidence to obtain summary judgment; once the movant points out an absence of proof on an essential element of the nonmovant's case, the burden shifts to the nonmovant to provide evidence to the contrary." *Hall*, 935 F.2d at 1111, n. 5. Additionally, "the court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

### *Qualified Immunity*

The affirmative defense of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). "When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

When a defendant raises a qualified immunity defense in response to a motion to dismiss or a motion for summary judgment,[3] the burden shifts to the plaintiff and the court employs a two-part test. *Morris v. Noe*, 672 F.3d 1185, 1191 (10th Cir. 2012); *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011). A plaintiff must show that: (1) the defendant violated a constitutional right, and (2) the constitutional right was clearly established at the time of the defendant's alleged misconduct. *Id.* The court must not "define clearly established law at a high level of generality." *City and Cnty. of San Francisco, Calif. v. Sheehan*, 135 S.Ct. 1765, 1775-76 (2015); *Knopf v. Williams*, 884 F.3d 939, 944 (10th Cir. 2018) (citing *Ashcroft*, 563 U.S. at 742);. This is an objective test. *Brown*, 662 F.3d at 1164. "In order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Id.* (citation omitted). The "clearly established law must be 'particularized' to the facts of the case." *Knopf*, 884 F.3d at 944 (citations omitted).

A plaintiff must establish both prongs to defeat a qualified immunity defense. *Id.* Only if a plaintiff first meets this two-part test does the defendant bear the traditional summary judgment

---

[3]     "The legally relevant factors for a qualified immunity decision will be different at the summary judgment state – no longer can the plaintiffs rest on facts as alleged in the pleadings." *Stonecipher v. Valles*, 759 F.3d 1134, 1148, n.9 (10th Cir. 2014).

burden to show that there are no genuine disputes of material fact and that he or she is entitled to summary judgment as a matter of law. *Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011). The court has discretion to decide which of the two prongs to address first in light of the circumstances of the case. *Brown*, 662 F.3d at 1164.

## II. DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS[4]

1.  The Individual Defendants are certified peace officers in the State of Oklahoma. *City of Tahlequah's SJM, Docket No. 60, at 5, Fact #1, admitted in Plaintiff's Response, Docket No. 71*.

    a.  Officer Randy Tanner is a CLEET certified police officer for the City of Tahlequah Police Department ("TPD"). He obtained his certification in 2000 and is a CLEET certified firearms instructor. *Randy Tanner's SJM, Docket No. 58, at 7, Fact #1, admitted in Plaintiff's Response, Docket No. 72*.

    b.  Officer Bronson McNiel is a CLEET certified police officer for the TPD. He obtained his CLEET certification in 2010. *Bronson McNiel's SJM, Docket No. 59, at 6, Fact #1, admitted in Plaintiff's Response, Docket No. 73*.

    c.  Officer Reed Felts is a CLEET certified police officer for the TPD. He obtained his CLEET certification in 1995. *Reed Felts' SJM, Docket No. 62, at 6, Fact #1, admitted in Plaintiff's Response, Docket No. 73*.

---

[4] Defendants' counsel filed five separate motions for summary judgment, one for each Defendant. The statement of facts in four of the motions and Plaintiff's responses thereto are substantially the same with few adjustments or additions. Marshal Buhl's motion includes fewer facts, but still repeats many of the same facts listed in the other motions. The court primarily cites to the briefing for the City herein, but includes citations to the briefing for the Individual Defendants where necessary.

d.  Shannon Buhl is the Marshal of the Cherokee Nation Marshal's service and has worked for the Nation since August 13, 2000. *Buhl's SJM, Docket No. 61, at 5, Fact #1, admitted in Plaintiff's Response, Docket No. 74.* Marshal Buhl has been trained as a SWAT Commander through the National Tactical Officer Association on Command and Decision Making. *Docket No. 61, at 6, Fact #3, admitted in Docket No. 74.*

2.  On Saturday, June 27, 2015, Officer Tanner was working in his capacity as a Patrol Officer[5] and Field Training Officer ("FTO") for the City. *Tanner's Affidavit, Docket No. 60, Exh. 1.* He was riding with Officer McNiel, who was in his third phase of training since joining the TPD on May 15, 2015. *Id.* In the third phase of training the FTO is simply to watch the trainee's performance unless the circumstances warrant the FTO to take action. *Id.* Officer Felts was working in his capacity as a patrol officer for the TPD. *Docket No. 62, at 6, Fact #2, admitted in Docket No. 73.* Despite acting as an FTO, on June 27, 2015, Officer Tanner violated TPD policy by failing to activate his Portable Video Recording System ("PVRS") / body camera device. *Tanner Deposition, Docket No. 71, Exh. 1, at 3-7.*

3.  At approximately 11:50 a.m., TPD received a 911 call stating that there was a disturbance in the alley between Lee and Mission Streets and that there were two men with guns on their sides in a white 3/4 ton Dodge truck. The caller identified himself as Billy Switson, and said he got his information from his neighbor who was scared. *Docket No. 60, at 6, Fact #3, admitted in Docket No. 71.*

---

[5]     Officer Tanner had previously been a Sergeant, but "self-demoted" himself back to Patrol Officer because of the working hours. *Docket No. 71, Exh. 1, at 2.*

4. Officer McNiel was assigned to respond to the report of the disturbance. He and Officer Tanner responded in Officer McNiel's car. The other two on-duty officers, Pam Bell and Reed Felts, also responded due to the nature of the call. *Docket No. 60, at 6, Fact #4, admitted in Docket No. 71.*

5. Officer Felts arrived first and located the 3/4 ton Dodge truck parked in a yard on the west side of the alley, behind a house on S. Mission Street. He ran the tag number and the dispatcher advised a short time later the vehicle was reported stolen. *Docket No. 60, at 6, Fact #5, admitted in Docket No. 71.*

6. Officers Tanner and McNiel arrived and parked their car in the alley south of where the white Dodge truck was parked. Before getting out of his car, Officer McNiel activated his body-worn camera. *Docket No. 60, at 6, Fact #6, admitted in Docket No. 71.*[6]

7. Officers Tanner and McNiel then walked up to the white Dodge truck. Officer Tanner observed there was ammunition laying in the bed of the truck. *Docket No. 60, at 7, Fact #7, admitted in Docket No. 71.*

8. Officer Pam Bell arrived on the scene and also went to the truck. *Docket No. 60, at 7, Fact #8, not disputed in Docket No. 71.* Plaintiff adds that when Officer Bell arrived on the scene, she also failed to activate her PVRS / body camera device in violation of TPD policy. *Garner Deposition, Docket No. 71, Exh. 2, at 11-2; Bell Deposition, Docket No. 71, Exh. 3, at 53-54.*

9. Officer Felts observed a juvenile white male ("OAA") on the screened porch located on the west side of the residence of 532 ½ S. Mission and requested him to come talk to him.

---

[6] Plaintiff again notes that Officer Tanner did not activate his body-worn camera, in violation of TPD policy.

*Docket No. 60, at 7, Fact #9, not disputed in Docket No. 71.* Plaintiff adds that Officer Felts claims he activated his PVRS / body camera device upon exiting his patrol vehicle, but it did not record anything. *Felts Deposition, Docket No. 71, Exh. 4, at 2.*

10. Officer Felts patted OAA down for weapons and asked him if he knew who had been driving the stolen truck. OAA advised he did not know and that he had just arrived to see his friend Josh, who was 16. *Docket No. 60, at 7, Fact #10, admitted in Docket No. 71.*

11. Officer Felts then handcuffed OAA and told him he was not under arrest and was just being detained until they could figure out what was going on. *Docket No. 60, at 7, Fact #11, admitted in Docket No. 71.*

12. Other people then started coming out of the house onto the screened porch, but then went back in the house. Officers then began to call to those people to come out. *Docket No. 60, at 7, Fact #12, admitted in Docket No. 71.*

13. Separating the porch from the yard and alley area where the truck was located was a retaining wall approximately three feet high. Officers Tanner and Bell stepped down to the porch level to engage anyone on the porch at 12:02:24. *Docket No. 60, at 7, Fact #13, admitted in Docket No. 71.*

14. Officer Felts then joined Officers Tanner and Bell near the back porch. A white male, later identified as James Neugin, and a white female, later identified as Katherine Temple, came out on the porch and spoke with Officer Felts, who began to explain to them what their investigation was about. *Docket No. 60, at 8, Fact #14, admitted in Docket No. 71.*

15. During this time, Officer McNiel stayed back by the truck to cover the officers on the porch. *Docket No. 60, at 8, Fact #15, admitted in Docket No. 71.*

16. While Officer Felts spoke with the occupants who came out on the porch, Officer Bell heard glass breaking on the southwest corner of the house, so she ran that way to investigate. Officer McNiel then left his position at the truck and ran to the southwest corner of the house as well. *Docket No. 60, at 8, Fact #16, admitted in Docket No. 71.*

17. When Officer Bell reached the south end of the house, she saw someone looking out. *Docket No. 60, at 8, Fact #17, admitted in Docket No. 71.*

18. Simultaneously, Officer Felts asked Ms. Temple why someone would be busting a window out. *Docket No. 60, at 8, Fact #18, admitted in Docket No. 71.*

19. Ms. Temple then advised Officer Felts that her son,[7] Benjamin Brown, was inside the house. *Docket No. 60, at 8, Fact #19, admitted in Docket No. 71; Docket No. 60, Exh. 5, at 12:03:50 – 12:04:00.*

20. Officer Felts instructed Ms. Temple to call him out of the house with his hands up, and she complied. Benjamin Brown then came out, and Officer Felts patted him down and asked him about the truck. Mr. Brown stated he was just a passenger in the truck and that his friend Steven had driven it, but that Steven had already left. *Docket No. 60, at 8, Fact #20, admitted in Docket No. 71.*

21. Mr. Brown was then handcuffed and detained. *Docket No. 60, at 9, Fact #21, admitted in Docket No. 71.*

22. Officer Felts ran a warrants check over the radio, also known as "44" on Mr. Brown. *Docket No. 60, at 9, Fact #22, admitted in Docket No. 71.*

---

[7]     Defendants' statement of facts refers to Mr. Brown as Ms. Temple's "nephew" here, but later as her "son." In McNiel's video, "son" rather than "nephew" can be heard.

23. Officer Felts asked that someone drive a patrol car around front to put Mr. Brown into it. Officer Tanner drove Officer McNiel's car around to the east side of the house on Mission. *Docket No. 60, at 9, Fact #23, admitted in Docket No. 71.*

24. While the records check on Mr. Brown was being conducted, Officer Bell looked in the front passenger seat of the white Dodge truck and found a loaded .22 caliber revolver. *Docket No. 60, at 9, Fact #24, admitted in Docket No. 71.*

25. Officer Bell announced over the radio that she had found a revolver in the vehicle. *Docket No. 60, at 9, Fact #25, admitted in Docket No. 71.*

26. The dispatcher advised over the radio that Mr. Brown had a warrant with a $15,000 bond. *Docket No. 60, at 9, Fact #26, admitted in Docket No. 71.*

27. Officer Felts then advised Officer McNiel that they needed to clear the house. *Docket No. 60, at 9, Fact #27, admitted in Docket No. 71.*

28. Officer Felts advised that someone needed to stay out front to watch him (referring to Mr. Brown) so that he did not kick out a window. *Docket No. 60, at 9, Fact #28, admitted in Docket No. 71.*

29. Officers Felts and McNiel entered onto the back porch so that they could enter the house and clear it. Ms. Temple left the porch and went back into the house, and Officer Felts advised that she needed to get back out. Officer Felts told Ms. Temple: "Here's the deal, your son's buddy is in here. He needs to come out now with his hands out, okay. If he jumps out, we're probably going to shoot him, okay." *Docket No. 60, at 9-10, Fact #29,*

*not disputed in Docket No. 71; McNiel Video, Docket No. 60, Exh. 5, at 12:09:19 –*

*12:09:31.*[8]

30. Officer Felts and McNiel entered the house to clear it. *Docket No. 60, at 10, Fact #30,*

*not disputed in Docket No. 71.*[9]

31. At 12:10:25, Officer Felts asked Officer McNiel if the bedroom they were entering was

the one where the window was being busted out, and Officer McNiel advised that it was.

*Docket No. 60, at 10, Fact #31, not disputed in Docket No. 71.* Plaintiff adds that at

12:10:31, Officer Felts can be heard yelling at Josh, "Steve, if you're in here, you need to

call out right now so you don't get shot!" *Docket No. 60, Exh. 5 at 12:10:31 –*

*12:10:35].*[10]

32. At 12:10:56, on Officer McNiel's recording, you can hear Officer Tanner yelling loudly,

"Hey, get down!" *Docket No. 60, at 10, Fact #32, admitted in Docket No. 71.*

33. At 12:10:58, Officer McNiel rushed out of the house to see what was happening. *Docket*

*No. 60, at 10, Fact #33, admitted in Docket No. 71.*

---

[8]     Plaintiff does not dispute these facts, but argues that the statement "if he jumps out, we're probably going to shoot him" unnecessarily escalated the danger of the situation and indicated that the officers on the scene were predetermined to use deadly force on Josh regardless of the surrounding circumstances. *Docket No. 71, at 7, response to Fact #29.* Plaintiff's argument is conclusory and has no evidentiary support.

[9]     Plaintiff argues that no resident of the home consented to the Officers' entry and that the lack of consent adds to the unreasonableness of the use of deadly force. *Docket No. 71, at 7, response to Fact #30.* Plaintiff is incorrect. In McNiel's video, Officer McNiel can be heard saying, "Okay, we will, ma'am, thank you. Okay, we will, we'll go check." Ms. Temple then can be heard saying, "You're welcome to check," to which Officer McNiel again replied, "Yes ma'am, we will." *Docket No. 60, Exh. 5, at 12:05:42 – 12:05:56.*

[10]     Plaintiff argues that this statement also unnecessarily escalated the danger of the situation by threatening to shoot Josh at a time when Josh posed no threat to anyone. Defendants correctly point out that this is a conclusory allegation with no evidentiary support.

34. Once Officer McNiel got outside, he could see Officer Tanner pointing a Taser upward toward the attic vent on the north end of the house which had been removed. *Docket No. 60, at 10, Fact #34, admitted in Docket No. 71.*

35. Officer McNiel also looked upward and began yelling, "Get your hands up now! Let me see your hands now!" *Docket No. 60, at 10, Fact #35, admitted in Docket No. 71.*

36. At 12:11:08, Officer McNiel yelled, "Get your hands up now! Get out! Let me see your hands! You better get your [expletive] hands…" *Docket No. 60, Exh. 5, at 12:11:08 – 12:11:15.* Officer McNiel then stopped short and exclaimed, "He's got a gun! He's got a gun!" and retreated to the northwest corner of the house. *Docket No. 60, at 10, Fact #36, not disputed in Docket No. 71; Docket No. 60, Exh. 5, at 12:11:15 - 20.*[11]

37. Officer Tanner retreated to the northeast corner of the house. *Docket No. 60, at 11, Fact #37, admitted in Docket No. 71.*

---

[11]     It is undisputed that Josh was wearing a gun holster, but Plaintiff disputes that he had a gun. Plaintiff argues that according to Benjamin Brown, Josh left his handgun in the truck and was unarmed when he entered the home. *Docket No. 71, at 7-8, response to Fact #36.* Plaintiff also argues that Defendants' version of events makes no logical sense because if Josh was "pointing a gun upward," Officer McNiel would not simultaneously demand that he "get his hands up" and to let McNiel "see his hands." *Docket No. 71, at 8, response to Fact #36.* It is clear from the video, however, that this was not simultaneous. Officer McNiel first shouted to Josh to get his hands up, then stopped and shouted to his fellow officers that Josh had a gun.

Officer McNiel avers and testified at his deposition that when he rushed to the north end of the house, he could see the attic vent cover had been removed and he saw a white male holding a pistol which was pointed upward. *Docket No. 60, Exh. 4, at 3; Docket No. 85, Exh. 1, at 3.* Defendants argue that the reaction of Officer McNiel is ample proof that he saw Josh with a gun in the attic. *Docket No. 60, Exh. 5, at 12:11:14.* Defendants further argue that Benjamin Brown had been in custody for a full five minutes and could not have known what Josh was doing or what he had.

Additionally, a still photograph from Officer McNiel's body camera at 12:14 shows what appears to be a black pistol lying above Josh's head next to a fence. *Docket No. 60, Exh. 9.* Another photograph, taken later by OSBI, clearly shows a black pistol lying next to the same fence. *Docket No. 60, Exh. 11.*

38. A voice recorded on Officer McNiel's body camera can be heard to say, "Back up, back up. Let me out." *Docket No. 60, at 11, Fact #38, not disputed in Docket No. 71; Docket No. 60, Exh. 5, at 12:11:18.*

39. Officer Bell yelled at the suspect to "drop that gun!" The suspect replied, "Let me out please." Officer Bell replied, "You're not getting out, drop the gun." *Docket No. 60, at 11, Fact #39, not disputed in Docket No. 71; Docket No. 60, Exh. 5, at 12:11:26 – 12:11:30.* Plaintiff adds that at this time, Officer Bell had not seen the gun, she had only been told the suspect had a gun. *Docket No. 71, Exh. 3, at 7.*

40. Officer Felts had stayed in the house to cover the attic access which was located in a hallway. Officer Bell yelled to Officer Felts, "He's got a gun! He's got a gun!" Officer Felts acknowledged by saying, "I understand." *Docket No. 60, at 11, Fact #40, admitted in Docket No. 71.*

41. Officer McNiel got on his radio and asked for more units if possible and added, "We've got one that's trapped in an attic with a gun." *Docket No. 60, at 11, Fact #41 admitted in Docket No. 71.*

42. At 12:12:00 Officer Felts radioed that he could hear the suspect in the attic and was holding the attic access and was sending two other innocent bystanders out of the house. *Docket No. 60, at 11, Fact #42, admitted in Docket No. 71.*

43. At 12:12:20, Officer McNiel announced on the radio, "Be advised, he is armed with a black pistol." *Docket No. 60, at 11, Fact #43, admitted in Docket No. 71.*

44. At 12:12:30, Officer Felts radioed the dispatcher and asked that the police chief be contacted and advised of the situation and that he was requesting a SWAT callout. *Docket No. 60, at 11, Fact #44, admitted in Docket No. 71.*

45. Officer McNiel can be heard admonishing the people on the back porch for moving around. *Docket No. 60, at 12, Fact #45, not disputed in Docket No. 71; Docket No. 60, Exh. 5, at 12:12:41.*[12]

46. At 12:12:50, Officer Felts came to the back porch and told the removed occupants of the house, "…there is a guy in the attic with a gun. This is very, very serious. I don't want y'all hurt and I don't want to have to kill him. I need for you guys to listen to me. . . . I need you guys to be cooperative. Right now is not the time to get feelings hurt, okay? I will apologize later." *Docket No. 60, at 12, Fact #46, admitted in Docket No. 71.*

47. At 12:13:27, Officer Bell looked around the southwest corner of the house and yelled, "…I've got sights on you! Show me your hands! Show me your hands!" *Docket No. 60, at 12, Fact #47, not disputed in Docket No. 71.* Plaintiff adds that at 12:13:26 in the McNiel video, Officer McNiel is heard stating into his hand-held radio, "64, we've got him" and that "64" was Officer Tanner's badge number. *Docket No. 5, at 12:13:26; McNiel Deposition, Docket No. 71, Exh. 6, at 5-6.*[13]

48. At 12:13:34, Officer Bell briefly retreated from the southwest corner, but then returned and looked around the corner and yelled, "Put the gun down!" *Docket No. 60, at 12, Fact #48, not disputed (skipped) in Docket Nos. 71, 72, and 73; Docket No. 60, Exh. 5, at 12:13:34 – 12:13-44.*

---

[12] Plaintiff adds that Officer McNiel admonished them by screaming at them, "Don't you [expletive] move!" *Docket No. 71, at 8, response to Fact #45.* Defendants correctly argue that this is immaterial, and Plaintiff offers no argument as to its materiality. The court notes that Officer McNiel can later be heard apologizing to them. *Docket No. 60, Exh. 5, at 12:22:44.*

[13] Plaintiff again argues that it is notable that the officers kept telling Josh to show them his hands, despite their assertions that they could see a gun in his hands.

49. Officer Bell avers that she saw the suspect stick a gun held in his hand out of the attic vent on the south end of the house and point it back and forth from east to west and that when it was pointed west, it was pointed towards her. *Bell Affidavit, Docket No. 60, Exh. 8, at 2.*[14]

50. Officer Bell then observed the legs of the suspect protruding through the attic vent on the south end of the house. Believing he was going to jump down, she rapidly retreated to the northwest corner of the house where Officer McNiel was located and yelled, "He jumped! He jumped!" *Docket No. 60, at 12, Fact #50, not disputed in Docket No. 71.*[15]

51. Officer Felts radioed that "…he should be on the ground now." *Docket No. 60, at 12, Fact #51, not disputed in Docket No. 71.*

52. At 12:14:03, Officer Bell announced, "He's got a pistol. He jumped. I believe he did." *Docket No. 60, at 13, Fact #52, not disputed in Docket No. 71; Docket No. 5, at 12:14:03 – 12:14:07.*

53. At 12:14:07 – 12:14:09, gunshots rang out. *Docket No. 60, Exh. 5, at 12:14:07 – 12:14:09.* Plaintiff notes that at no point between the time that Josh purportedly jumped

---

[14]      Again, Plaintiff disputes that Josh had a gun. Plaintiff argues that because of Officer Bell's violation of the TPD body camera video policy and other spoliation of evidence and equipment, there is no video to back Officer Bell's claim. *Docket No. 71, at 8, response to Fact #49.* Plaintiff also cites to Benjamin Brown's affidavit, stating that Josh did not have a gun. *Docket No. 71, Exh. 5, at 2.*

Defendants' expert, James Clark, notes that Mr. Brown's affidavit is inconsistent with statements he made to OSBI the day of the shooting. *Docket No. 85, Exh. 2, at 3.* Mr. Clark further explains that Mr. Brown was 70 to 80 feet away from the shooting sitting in the backseat of a patrol car with the window rolled up, that the car he was in was too far north to see the attic hole from which Josh jumped, and that there were obstructions to his vantage point, namely small trees. *Docket No. 85, Exh. 2, at 4.* Mr. Clark avers that Mr. Brown could not "clearly" see that Josh did not have anything in his hands. *Docket No. 85, Exh. 2, at 4-5.*

[15]      Officer Bell testified that although she did not see Josh jump, based on the way his body was positioned when she saw him, she believed he was jumping. *Docket No. 85, Exh. 3, at 5.*

from the attic to the time that Officer Tanner began firing shots do Officers Bell or McNiel hear Officer Tanner state anything to Josh. *Docket No. 71, at 9, response to Fact #s 50-53.* Plaintiff further notes that none of the officers on the scene, aside from Officer Tanner, witnessed the shooting. *Id.*

54. At 12:14:12, Officer Felts asked, "who is firing?" Officer Bell replied, "I don't know." Officer McNiel yelled, "Tanner, are you alright?" *Docket No. 60, Exh. 5, at 12:14:12 – 12:14:16.* Plaintiff notes that the fact that Officers Bell and McNiel were inquiring as to who fired the shots further demonstrates that they were not eyewitnesses to the actual shooting. *Docket No. 71, at 9, response to Fact #54.*

55. Officer Felts then exited the house and led Officers McNiel and Bell to the south end of the house. *Docket No. 60, at 13, Fact #55, admitted in Docket No. 71.*

56. At 12:14:24, Officer McNiel's recording captured the image of Officer Tanner standing with his gun drawn, facing west. *Docket No. 60, at 13, Fact #56, admitted in Docket No. 71.*

57. At 12:14:24 – 12:14:29, as Officer Felts approached the south end of the house, he announced, "Shots fired. Shots fired. We need EMS, we have a suspect down." *Docket No. 60, at 13, Fact #57, admitted in Docket No. 71.*

58. Officer McNiel approached the suspect laying on the ground when Officer Felts stated that he was still moving and told McNiel to "get his hands." *Docket No. 60, at 13, Fact #58, admitted in Docket No. 71.*

59. Officer McNiel approached the suspect and handcuffed him at 12:14:40. *Docket No. 60, at 13, Fact #55, as clarified by Docket No. 71, at 9.*

- o Officer McNiel had been trained to handcuff armed suspects who have been shot by the police to ensure their safety, as well as the safety of officers and the public. *Docket No. 59, at 19, McNiel's Fact #94, not disputed in Docket No. 73, Plaintiff's response.*[16]

60. At 12:14:40 – 12:14:45 of Officer McNiel's video, a black object resembling a pistol can be seen. *Docket No. 60, Exh. 5, at 12:14:40 – 12:14:45.* Plaintiff argues that it could just as easily be a shadow or a patch of soil. At 12:15:38 – 12:15:44 and again at 12:17:15 – 12:17:16, while Officer Felts was securing the scene, Officer McNiel points out the gun, first stating, "Hey, I'm gonna get this gun. Okay, nevermind, it's secure. It's over there. It's over there," and later stating, "The gun's right there. There's the gun right there next to him." *Docket No. 60. Exh. 5, at 12:15:38 – 12:15:44 and 12:17:15 – 12:17:16.*[17]

61. At 12:14:43 of Officer McNiel's recording, during the time he was handcuffing the suspect, the recording captured the image of a black gun holster on the belt of the suspect, on his right side. *Docket No. 60, at 13-14, Fact #61, not disputed in Docket No. 71.* Plaintiff notes that the video shows that Josh's holster was empty and that this is consistent with Benjamin Brown's statement that when Josh entered the house, Mr. Brown could see that there was no gun in his holster or anywhere on his person and that the only item Josh brought into the house was a cellular phone. *Brown Affidavit, Docket No. 71, Exh. 5, at 2.*

---

[16]    Plaintiff refers to her response to Felts' Fact #62 and McNiel's Fact #63.

[17]    Plaintiff also notes that Officer Bell testified that she never saw the gun on the ground despite scanning for it after the shooting. *Docket No. 71, Exh. 3, at 16-17.* Officer Bell never approached Josh or got any closer to him than the southeast corner of the house, which was 15 to 20 feet from him. *Id.; Docket No. 85, Exh. 3, at 7; Docket No. 60, Exh. 8, at 2.*

62. The gun was later photographed as part of the crime scene. *Docket No. 60, at 14, Fact #62, not disputed in Docket No. 71; Photograph, Docket No. 60, Exh. 11*. Plaintiff adds that the photograph was taken by an investigator from the Oklahoma State Bureau of Investigation ("OSBI") well over an hour after Josh was shot. *OSBI Report, Docket No. 71, Exh. 8, at 90 (noting that the OSBI agent arrived at approximately 13:22)*.

63. At 12:14:46 on Officer McNiel's recording, Officer Tanner stated, "He pointed it at me." *Docket No. 60, at 14, Fact #63, admitted in Docket No. 71*. While Plaintiff admits that Officer Tanner made the statement, Plaintiff disputes its verity, arguing there is significant evidence to the contrary. Benjamin Brown avers that from his vantage point in the back of the police vehicle, he could clearly see the entirety of both the south and east sides of the house and watched as Josh kicked out the attic vent. *Docket No. 71, Exh. 5, at 3*. Officer Tanner told OSBI Agent Vicky Lyons that the carport would not have blocked Mr. Brown's view. *Docket No. 71, Exh. 1, at 8*. Mr. Brown further avers that he heard Josh yell out, "Don't shoot! Don't shoot! I'm coming down!" while Officer Tanner was standing at the southeast corner of the house with his gun pointed at the hole Josh had kicked out. *Docket No. 71, Exh. 5, at 3*. Mr. Brown avers that when Josh jumped, he landed face down on his chest and then pushed himself up to his feet. *Id*. Mr. Brown avers that he could see that Josh had nothing in his hands and that just as Josh made it to his feet, Officer Tanner fired six shots at him. *Id*. One of the bullets entered the back of Josh's head. *Medical Examiner Report, Docket No. 71, Exh. 9, at 4*. Plaintiff also notes that Officer Tanner and Benjamin Brown are the only known surviving

eyewitnesses to the shooting. As noted above, Defendants dispute that Mr. Brown could clearly see whether Josh had a gun.[18]

- o At 12:14:48 of Officer McNiel's recording, Officer Felts, after looking at Josh's gunshot wound to the head, stated: "He's thirty," referring to police parlance for signal 30, meaning a fatality. *Docket No. 62, at 13, Fact #63.* Plaintiff admits that Felts stated that Josh was "30" at 12:14:48, but disputes that Josh was, in fact, deceased at that time. *Docket No. 73, at 11, response to Fact #63.*

64. At 12:14:55 on Officer McNiel's recording is an image of the south end of the house at 532 ½ S. Mission showing an opening in the attic vent. The recording also shows Officer Bell standing at the southeast corner of the house. *Docket No. 60, at 14, Fact #64, admitted in Docket No. 71.*

65. Officer Bell never got any closer to the suspect than the area of the southeast corner of the house. *Docket No. 60, at 14, Fact #65, admitted in Docket No. 71.* Plaintiff adds that Officer Bell testified that she never saw the gun on the ground despite "scanning" for it from the southeast side of the house after the shooting. *Docket No. 71, Exh. 3, at 16-17.*

66. Officer Bell's body-worn camera erroneously stated the date and time, as the camera battery had previously gone dead, and when re-charged, defaulted to the date of August 1, 1970. The beginning time of 03:57:48 is also wrong. *Docket No. 60, at 14, Fact #66, admitted in Docket No. 71.*

---

[18] Plaintiff states that approximately one minute after the shooting, Officer Tanner can be seen smiling. Just before the point in the video cited by Plaintiff, Officer McNiel had asked Officer Tanner if he was alright. As Officer McNiel approached, Officer Tanner's face was not visible due to shadow. *Docket No. 6, Exh. 5, at 12:15:04 – 12:15:08.*

67. Officer Bell's recording is partially obstructed because her lens selector for daylight and night vision was in a position mid-way through the change between the two. *Docket No. 60, at 14, Fact #67, admitted in Docket No. 71.*

68. At 12:15:11 on Officer McNiel's recording, Officer Felts announced to the other officers to stop and remember they now had an active crime scene, for everyone to stay where they were and hold what they had, and that the area would be taped off. *Docket No. 60, at 14-15, Fact #68, admitted in Docket No. 71.*

69. At 12:15:36 on Officer McNiel's recording, he announced that he was "going to get this gun." *Docket No. 60, at 15, Fact #69, admitted in Docket No. 71.*

70. At 12:15:40 on Officer McNiel's recording, Officer Felts responded by saying, "Everything needs to stay . . . ." Officer McNiel responded, talking over Officer Felts, with "Okay, never mind, it's secure. It's over there." Officer Felts then responded, "We're secure, and the gun is secure." *Docket No. 60, at 15, Fact #70, admitted in Docket No. 71.*

71. At 12:16:32, Officer McNiel's recording captured Officer Tanner still standing watch over the suspect and the crime scene area. *Docket No. 60, at 15, Fact #71, admitted in Docket No. 71.*

72. At approximately 12:17:22, Marshal Shannon Buhl of the Cherokee Marshal's Service arrived on the scene.[19] Officer Felts asked him if he had some crime scene tape and

---

[19] Marshal Buhl had been on duty with several other Cherokee Nation Marshals when he overheard radio traffic from the TPD regarding a suspect in the attic of a house armed with a gun and a request for more units and a SWAT team to respond. *Docket No. 61, at 5-6, Fact #2, admitted in Docket No. 74.* Marshal Buhl went to the scene with Cherokee Marshals Buddy Clinton, Faron Pritchett, and Mike Reese. *Docket No. 61, at 6, Fact #4, admitted in Docket No. 74.*

advised that there had been an officer-involved shooting. *Docket No. 60, at 15, Fact #72, admitted in Docket No. 71.*

73. At 12:17:51 on Officer McNiel's recording, Officer Felts advised Officer Tanner that he needed to take possession of Officer Tanner's gun and needed him to sit in a car. *Docket No. 60, at 15, Fact #73, admitted in Docket No. 71.*

74. At 12:18:40 on Officer McNiel's recording, Marshal Buhl, following standard police protocol, walked up to Officer Tanner and gave Officer Tanner his gun since Officer Tanner's gun had been collected as evidence. *Docket No. 60, at 15, Fact #74, admitted in Docket No. 71.*

75. At 12:19:00 on Officer McNiel's recording, Cherokee Marshal Faron Pritchett, who was located at the northeast corner of the house, yelled out to someone off camera to "Come help us clear this house." *Docket No. 60, at 16, Fact #75, admitted in Docket No. 71.*

76. At 12:19:02 on Officer McNiel's recording, Officer McNiel advised Marshal Pritchett, "You don't know what's going to be in there man, these guys were hiding. There could be more people." *Docket No. 60, at 16, Fact #76, admitted in Docket No. 71.*

77. At 12:19:42 on Officer McNiel's recording, Marshal Buhl can be seen approaching Josh and putting on rubber gloves. Shortly thereafter Officer McNiel pointed out the gun on the ground to Marshal Buhl. *Docket No. 60, at 16, Fact #77, not disputed in Docket No. 71.* Plaintiff disputes that a gun is clearly visible on the ground from McNiel's video and adds that Bell never saw the gun on the ground despite "scanning" for it from the southeast corner of the house. Docket No. 71, at 9, response to Fact # 77.

78. At 12:19:56 on Officer McNiel's recording, Marshal Buhl turned Josh over on his back. *Docket No. 60, at 16, Fact #78, not disputed in Docket No. 71.* Plaintiff adds that at

12:20:13 of Officer McNiel's recording, Josh can be heard gasping for air after being shot. *Docket No. 60, Exh. 5, at 12:20:12.*

79. At 12:20:16 on Officer McNiel's recording, Marshal Buhl asked Officer Bell if she had an extra gun in her car. Marshal Buhl needed a gun since he just gave his gun to Officer Tanner. *Docket No. 60, at 16, Fact #79, admitted in Docket No. 71.*[20]

80. At 12:21:13 on Officer McNiel's recording, EMS arrived on the scene. The EMS prehospital care report also lists the time of arrival at 12:21. *Docket No. 60, at 16, Fact #80, admitted in Docket No. 71.*

    o Marshal Buhl made the decision to hold EMS from the scene until the attic could be cleared. Docket No. 61, at 7, Fact #15, admitted in Docket No. 74.[21]

81. At 12:22:16 on Officer McNiel's recording, Marshal Buhl asked Officer McNiel if he minded "helping my guys in there" since Officer McNiel was wearing a bulletproof vest. Officer McNiel then returned to the inside of the house. *Docket No. 60, at 16, Fact #81, admitted in Docket No. 71.*

82. After going inside the house, Officer McNiel encountered Marshal Pritchett, who was in the hallway with another Marshal in the process of clearing an area just off the hallway. Marshal Pritchett then pointed at the attic access door and asked Officer McNiel, "Have

---

[20]    When Marshal Buhl learned that the attic of the house had not been cleared for other suspects, he realized he needed a gun. *Docket No. 61, at 7, Fact #12, admitted in Docket No. 74.*

[21]    Plaintiff argues that Buhl's decision to hold EMS back from providing medical aid to Josh while Buhl searched for a pole camera was unreasonable under the circumstances, as Josh had been shot multiple times, was bleeding out on the ground, gasping for air, and clinging to life. Defendants argue that the decision to hold EMS outside of the scene was reasonable under the circumstances, as the attic had not been cleared and needed to be for the safety of the officers and EMS personnel. Defendants argue that the pole camera was the safest way to clear the attic, and once it became apparent one was not available, Marshal Buhl and another Cherokee Marshal searched it and then cleared EMS to enter the scene.

we cleared this at all?"  Officer McNiel replied, "he was the only one up there."  Marshal Pritchett then asked, "Do we know that for sure?"  Officer McNiel replied, "No, we don't know for sure."  *Docket No. 60, at 17, Fact #82, admitted in Docket No. 71.*

83. Marshal Pritchett then said, "Let me go outside and see if we can get a polecam."  *Docket No. 60, at 17, Fact #83, admitted in Docket No. 71.*  Plaintiff adds that while the officers were looking for a pole camera, Josh was lying on the ground bleeding from gunshot wounds and hanging onto his life.  Plaintiff also adds that the officers on the scene did not provide CPR or any other medical attention to Josh.

84. At 12:27:20, Officer McNiel stepped out of the crime scene and his recording captured a conversation between Officers Felts and Bell regarding EMS not being allowed to attend to Josh.  Officer Felts advised that they were waiting on a pole camera to make sure there was no one else in the attic.  Officer Bell then said, "That is ridiculous."  Officer Felts replied, "Well, they're SWAT, and we're not."  *Docket No. 60, at 17, Fact #84, not disputed in Docket No. 71.*  Plaintiff adds that during the time that emergency medical personnel were kept from Josh, he continued to gasp for air.  *Docket No. 71, Exh. 3, at 11-14.*  Defendants argue that EMS personnel were prevented from approaching because the scene had not yet been secured for the safety of the officers on scene as well as the EMS personnel.  *Docket No. 84, at 3.*

85. At 12:28:39, Officer McNiel's first camera recording ends.  *Docket No. 60, at 17, Fact #85, not disputed in Docket No. 71.*

86. At 12:28:40, Officer McNiel's second recording resumed.  *Docket No. 60, at 17, Fact #86, admitted in Docket No. 71.*

87. At 12:31:34 on Officer McNiel's second recording, Officer Felts asked Officer McNiel to open his trunk so that Officer Felts could put Officer Tanner's gun and gun belt in a secure location and advised him not to let anyone else in the trunk. *Docket No. 60, at 17, Fact #87, admitted in Docket No. 71.*

88. Marshal Buhl could not locate a pole camera to search the attic, so he and another Cherokee Marshal went into the attic and cleared it. *Docket No. 60, at 18, Fact #88, not disputed in Docket No. 71.* Plaintiff again adds that during this time, Josh was gasping his last breaths and EMS were being prevented from rendering aid to him. *Docket No. 71, Exh. 3, at 11-14.*

89. At 12:33:17, Officer Felts asked that someone start a crime scene log and stated that they were going in. Officer Felts then escorted several EMS personnel to Josh. *Docket No. 60, at 18, Fact #89, not disputed in Docket No. 71.* Plaintiff adds that as EMS arrived on the scene at 12:21:13, they were kept from administering aid to Josh for 12 minutes. *See Fact #80 above.*

90. None of the EMS personnel performed CPR on Josh after they were given access to him at the scene. *Docket No. 60, at 18, Fact #90, not disputed in Docket No. 71.* At 12:34:14 of the McNiel video, Officer Felts notes that Josh is still breathing. *Docket No. 60, Exh 5, at 12:34:14.*

91. The TPD requested the OSBI to investigate the shooting. *Docket No. 60, at 18, Fact #91, admitted in Docket No. 71.*

92. An autopsy on Josh was performed on June 28, 2015. The autopsy revealed that he had been struck three times – a penetrating gunshot wound to the lower abdomen, a grazing wound of the right hand, and a penetrating gunshot wound to the head. *Docket No. 60, at*

*18, Fact #92, not disputed in Docket No. 71.* Plaintiff adds that the Medical Examiner confirmed that one of the bullets entered through Josh's "[r]ight posterior scalp." *Docket No. 71, Exh. 9, at 4.*

93. The gunshot wound to Josh's head was a fatal injury which no amount of medical treatment or care could have changed or averted. *Docket No. 60, at 18, Fact #93, admitted in Docket No. 71.* Plaintiff argues that the obstruction of emergency aid for a period of 12 minutes after EMS arrived caused Josh unnecessary and increased pain and suffering during his last moments of life. Defendants argue the delay did not cause unnecessary and increased pain and suffering because the head wound caused immediate, fatal injury to his brain. *Docket No. 84, at 4, incorrectly citing to Docket No. 59, Exh. 11; Fell Affidavit, Docket No. 60, Exh. 23, at 2.*

94. After jumping from the attic, Josh came into Officer Tanner's view as he came toward Officer Tanner's location. *Docket No. 60, at 18, Fact #94, not disputed in Docket No. 71.*[22]

95. Officer Tanner avers and testified that Josh pointed a gun at him. *Tanner Affidavit, Docket No. 60, Exh. 1, at 4; Tanner Deposition, Docket No. 60, Exh. 25, at 3.*[23]

96. Officer Tanner avers that at the time he used deadly force, he believed Josh posed an immediate threat of serious bodily harm to him and the other officers present. *Docket No. 60, Exh. 1, at 5 and Exh. 25, at 10.*[24]

---

[22]    While Plaintiff does not dispute this fact, she refers to her response to the City's Fact #63.
[23]    Plaintiff refers to response to the City's Fact #63.
[24]    Plaintiff, referring back to her response to the City's Fact #63, argues that Officer Tanner's purported belief that Josh posed a threat of serious bodily harm was objectively unreasonable in light of the evidence that Josh pleaded with Tanner not to shoot before jumping from the attic and had no weapon or anything in his hands when he jumped from the roof, hit the ground and began to stand up.

97. Officer Tanner shot at Josh in rapid succession, but quit firing when Josh fell to the ground. *Docket No. 60, at 19, Fact #97, not disputed in Docket No. 71.*[25]

98. Officer Tanner has never received any training for first aid for a penetrating gunshot wound to the head. *Docket No. 60, at 19, Fact #98, admitted in Docket No. 71.*

   o Officer McNiel has never received any training on first aid for a penetrating gunshot wound to the head. *Docket No. 59, at 19, Fact #95, not disputed in Docket No. 73.*

99. On March 24, 2017, Plaintiff filed her Complaint alleging excessive force, negligent use of force, assault and battery, failure to provide medical care, and failure to provide medical assistance. *Docket No. 60, at 19, Fact #99, admitted in Docket No. 71.*

## III.    PLAINTIFF'S ADDITIONAL FACTS & SPOLIATION ALLEGATIONS

Plaintiff lists additional facts, most pertaining to her allegations of spoliation, which are also the subject of her pretrial motion, wherein Plaintiff requests sanctions, an adverse inference jury instruction, and an order allowing Plaintiff to question witnesses in front of the jury about destroyed, missing and/or manipulated evidence. The court includes these allegations here.[26]

1. Steve Garner, Assistant Police Chief of the TPD, testified with regard to the body camera footage and preservation, as well as TPD's video evidence policies and practices. *Docket No. 71, Exh. 2, at 2-5.*

---

[25]    While Plaintiff does not dispute this fact, she again refers to her response to the City's Fact #63.

[26]    The court does not include Plaintiff's references to other cases involving TPD.

2. According to policy, Officer Bell was required to activate her body camera device as soon as she arrived on the scene, but she did not activate it until after the shooting. *Id. at 11-12.*

3. Officer McNiel's and Officer Bell's body camera devices were physically destroyed sometime after the shooting. *Id. at 13 and 21.*[27] The SD cards from those two cameras are also missing. *Id. at 13-14 and 21.* The body cameras share identification numbers with their SD cards, but the identification stickers on the two destroyed body cameras were rubbed off. *Id. at 21-22.*

4. On the day of the shooting, however, Assistant Chief Garner transferred the videos from Officer McNiel's and Officer Bell's body cameras to an external hard drive, *which he maintained, i.e. preserved, in his office. Id. at 6-7.* When he transferred the video files, he renamed Officer Bell's. *Id. at 8.* Additionally, the date and time stamps on Officer Bell's video file are incorrect. *Id. at 9.* On Officer Bell's video file, the date is August 1, 1970 and the time is 3:57:48. *Id.* The incorrect date and time stamps are likely due to the body camera device's internal clock being reset, possibly due to a depleted battery. *Ward Affidavit, Docket No. 85, Exh. 4, at 3.* Although the date and time stamps are incorrect, the video could be synchronized with a radio log, as radio broadcasts can be heard in the recordings. *Id.*

---

[27] Assistant Chief Garner was told that Officer McNiel removed his body camera device from his duty uniform, placed it on his unit, and then drove off and ran over it. *Id. at 26.* He was also told that Officer Bell's was similarly lost at a fitness center and later turned in after having been run over. *Id.* Officer McNiel testified that his body camera device was lost in a foot pursuit in the winter of 2016. *Docket No. 71, Exh. 6, at 2.*

When asked whether there is a policy that requires a body camera device to be physically preserved after it is used and a shooting is involved, Assistant Chief Garner replied, "just the files it creates." *Docket No. 71, Exh. 2, at 13.*

Spoliation sanctions are proper where "(1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of evidence." *Jones v. Norton*, 809 F.3d 564, 580 (10th Cir. 2015) (citations omitted).

Ultimately, the videos taken on Officer McNiel's and Officer Bell's body camera devices on June 27, 2015 were preserved by Assistant Chief Garner and made available to Plaintiff. Plaintiff was not prejudiced by the fact that the video files were saved to an external hard drive rather than to TPD's server. The change in the name to Officer Bell's video file does not change the content of the actual video file; thus, again, the video file was preserved, and Plaintiff was not prejudiced. The fact that Officer Bell's body camera device recorded the incorrect time is also of no consequence.[28]

The fact that the body camera devices were destroyed after the video files had been removed from them, Officer McNiel's being at least several months later, has no bearing on the videos taken therefrom. The fact that the SD cards were lost after the video files had been moved to the external hard drive also has no bearing on the videos taken therefrom. TPD has a policy to transfer the video files from them to a more permanent storage device, and they were. Plaintiff has not produced any evidence that any video files were destroyed.

Plaintiff has not brought forth any evidence that any actual video footage was lost or destroyed, especially none that would have shown whether Josh had a gun, which is the crux of Plaintiff's excessive force claim. In fact, Plaintiff argues that the fact that Officers Bell and

---

[28]     Plaintiff admitted that Officer Bell's body-worn camera erroneously stated the date and time, as the camera battery had previously gone dead and when re-charged defaulted to the date of August 1, 1970. *Docket No. 71, at 11, response to Defendants' Fact #66.* Moreover, the video could be synchronized with a radio log, as radio broadcasts can be heard in the recordings. *Docket No. 85, Exh. 4, at 3.*

McNiel were inquiring as to who fired the shots demonstrates that they were not eyewitnesses to the actual shooting. *Docket No. 71, at 9, response to Defendants' Fact #54*.

Plaintiff simply argues that the video files were not preserved in complete accordance with TPD policy. As the video files were preserved and Plaintiff was not prejudiced, the court denies her motion for sanctions for spoliation at least for purposes of the summary judgment motions. Of course, if this action goes to trial, she may re-urge her motion at the pretrial conference.

## IV. FEDERAL CLAIMS

Plaintiff brings § 1983 claims against Officers Tanner and McNiel and the City for excessive force in violation of the Fourth Amendment. She brings § 1983 claims against all of the officers and the City for failure to provide medical care in violation of the Fourteenth Amendment. The individual officers have each claimed qualified immunity. The court first examines the claims against the officers, including their individual requests for qualified immunity.

### A. Fourth Amendment – Excessive Force – Officers Tanner & McNiel

An excessive force claim brought under the Fourth Amendment depends on the objective reasonableness of the officer's actions. *See Estate of Booker v. Gomez*, 745 F.3d 405, 418-19 (10th Cir. 2014). The test of reasonableness under the Fourth Amendment "requires careful attention to the facts and circumstances of each particular case." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The court must consider (1) the severity of the crime at issue, (2) whether the

suspect posed an immediate threat to the safety of the officers or others, and (3) whether he was actively resisting arrest or attempting to evade arrest by flight.  *Id.*

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.* at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Id.* at 396-97. Ultimately, the question is whether the officers' actions were "'*objectively reasonable*' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id.* at 397 (emphasis added).

### *Officer Tanner*

Plaintiff argues that Officer Tanner used excessive force when he shot Josh.  She argues that Josh had no weapon in his hands and was attempting to surrender to the police.  As the court discusses below, the evidence that Josh had a gun is overwhelming, and Plaintiff's only evidence that he did not is an affidavit that contradicts the record and the affiant's former statements to police.

On July 27, 2015, the police responded to a 911 call stating that there was a disturbance in the alley between Lee and Mission Streets and that there were *two guys with guns on their sides* in a white 3/4 ton Dodge truck.  *Docket No. 60, at 6, Fact #3, admitted in Docket No. 71*.  It is undisputed that Josh was wearing a gun holster.  Officer Bell avers that shortly before Josh jumped from the attic vent, "he stuck the gun out and moved it back and forth from east to west," and that when he pointed it west, he was pointing it at her."  *Bell Affidavit, Docket No. 60, Exh. 8, at 2*.  Officer McNiel avers that at some point he heard Officer Tanner yelling, and he rushed

to the north end of the house where he saw the attic vent cover had been removed and "a white male subject holding a pistol which was pointed upward." *McNiel Affidavit, Docket No. 60, Exh. 4, at 3*.

Officer Tanner avers that he "saw an arm sticking out of the [attic] vent opening holding a handgun, moving back and forth from east to west." *Tanner Affidavit, Docket No. 60, Exh. 1, at 4*. Officer Tanner further avers that after Josh jumped from the attic, he pointed a black handgun directly at Officer Tanner. *Id.* At his deposition, Officer Tanner testified that after Josh jumped out of the attic, he ran around the corner of the house with a gun in his hand pointed at Officer Tanner. *Docket No. 60, Exh. 25, at 3*.

Almost immediately after Josh was shot, Officer McNiel saw the gun lying close to him. *Docket No. 60, Exh. 4, at 4; Docket No. 60, Exh. 5, at 12:14:40 – 12:17:16*. Almost immediately after the shooting, in Officer McNiel's video, a black object resembling a pistol can be seen close to Josh, between his head and a fence. *Docket No. 60, Exh. 5, at 12:14:40 – 12:14:45*. Plaintiff argues that the black object could "just as easily be a shadow or a patch of soil," but a still photograph taken from that video shows a black pistol, not a shadow or patch of soil. *Docket No. 60, Exh. 9, at 2*. Plaintiff does not dispute that OSBI later took a photo of that gun in the same place, but argues the photo was taken over an hour after the shooting. *OSBI Report, Docket No. 71, Exh. 8, at 90 (noting that the OSBI agent arrived at approximately 13:22)*. The court is not sure whether Plaintiff intends to imply by this that the gun was "planted," but she offers no actual evidence to that effect, thus any such implication is speculative.

The only evidence Plaintiff has in support of her argument that Josh did not have a gun is Benjamin Brown's affidavit. He avers that Josh had a black handgun, but left it in the truck and

entered the house with only his cell phone. *Id. at 1-2.* He further avers that from his vantage point in the back of the patrol car, he could clearly see that Josh had nothing in his hands when Officer Tanner shot him. *Id.* It is undisputed that Mr. Brown's position in the back of the patrol car was too far north to see the hole Josh kicked out in the attic. *Clark Affidavit, Docket No. 85, Exh. 2, at 4.* It is undisputed that from the back of the patrol car, Mr. Brown was approximately 70 to 80 feet away from the shooting. *Id.* It is further undisputed that there were small trees next to the carport that could have obstructed Mr. Brown's view of the shooting. *Id.*

Moreover, Mr. Brown's affidavit contradicts his own statements to OSBI Agent Vicky Lyons after the shooting. After the shooting, he stated: "I did not see a gun. I am not saying there wasn't a gun, but I am saying I did not see one, and whenever he fell, I mean, it was a long drop and he just jumped back up and pow, pow, pow, pow." *Docket No. 85, Exh. 2, at 3; Docket No. 85, Exh. 5, at 13:59 – 14:10.* Mr. Brown acknowledges the inconsistency in his affidavit and avers that on the day of the shooting he was afraid to say he could clearly see that Josh did not have a gun. *Docket No. 71, Exh. 5, at 4.* Additionally, at the time of the shooting, Mr. Brown and Josh had been separated for more than five minutes, so he could not have known whether Josh had a gun.

In summary, as the court noted above, the evidence that Josh had a gun is overwhelming – three officers saw him with a black handgun, Officer McNiel's video shows their reactions to having seen it including yelling to the other officers that he had it, the black handgun is visible in Officer McNiel's video lying above Josh's head after the shooting, and the black handgun was later photographed by OSBI lying in the same place. Of course, the court views the evidence and draws reasonable inferences therefrom in the light most favorable to Plaintiff. Nevertheless, she cannot rely on mere innuendos. The court rejects any suggestion that the gun lying next to

Josh was "planted," as Plaintiff has presented no evidence of such. She also cannot rely solely on Mr. Brown's affidavit, which is blatantly contradicted by the record, including his own statements to OSBI. No reasonable jury could believe Mr. Brown's version of the facts. Viewing the evidence and drawing *reasonable* inferences therefrom in the light most favorable to Plaintiff, she has not established a genuine issue of material fact.

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247-48) (emphasis in original). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* In support of Plaintiff's allegation that Josh did not have a gun, Plaintiff has offered only innuendos, conclusory allegations and an affidavit that is blatantly contradicted by the record, including by the affiant's own statements to OSBI. The court finds there is no genuine issue of material fact, and the shooting was objectively reasonable. Officer Tanner, therefore, did not violate Josh's constitutional rights.

Alternatively, even if Josh did not have a gun, it is clear from Officer McNiel's video that Josh was attempting to evade arrest by flight and that all of the officers on the scene believed that he posed an immediate threat of serious physical harm to the officers and possibly others if not apprehended. Officer Tanner was forced to make a split-second judgment—in circumstances that were tense, uncertain, and rapidly evolving—about the amount of force that was necessary. Again, the court finds that the shooting was objectively reasonable and Officer Tanner did not violate Josh's constitutional rights.

As to the second prong of the qualified immunity analysis, the court finds that Plaintiff again has not met her burden. While it is "clearly established that a law enforcement officer may not use force on a compliant suspect already under the officer's control and not resisting detention or trying to flee,"[29] Plaintiff did not create an issue of fact with regard to whether Josh was unarmed and attempting to surrender as she argues. In support of her assertion of the facts, she offered only innuendos, conclusory allegations and an affidavit that is blatantly contradicted by the record, including by the affiant's own statements to OSBI. There is no Supreme Court or Tenth Circuit decision holding that an officer may not use force under the circumstances in this case, nor would it be unlawful under the clearly established weight of authority from other courts.[30]

Officer Tanner did not violate Josh's Fourth Amendment rights. Moreover, Officer Tanner has asserted qualified immunity, and Plaintiff has failed to meet her burden to show that he violated a constitutional right or that the constitutional right was clearly established at the time of the alleged violation. Summary judgment, therefore, is granted as to this claim.

### *Officer McNiel*

In her Complaint, Plaintiff alleged that Officer McNiel used excessive force when he handcuffed Josh after he had been shot. Officer McNiel moved for summary judgment, and Plaintiff abandoned this claim in her response. *See Docket No. 73, at 17, n.2.* Accordingly, summary judgment is granted as to this claim.

---

[29]    *Chidester v. Utah County*, 268 Fed.Appx. 718, 729 (10th Cir. 2008)
[30]    Plaintiff cites to *Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006) in arguing that Officer Tanner's belief that Josh had a gun was unreasonable. Amongst the many other differences in that case, strikingly, witnesses on the scene were yelling to the officer that the suspect did not have a gun. *Walker*, 451 F.3d at 1160. In the case at bar, multiple officers were shouting that the suspect had a gun.

**B. Fourteenth Amendment – Failure to Provide Medical Care – Individual Officers**

Plaintiff brings Fourteenth Amendment claims against each of the officers for failure to provide medical care after Josh was shot. Plaintiff argues that the officers were deliberately indifferent to Josh's serious medical needs when they: (1) did nothing to assist him, including checking his vital signs or performing CPR, and (2) when they prevented EMS personnel on the scene from providing care for him for a period of 12 minutes. Plaintiff does not argue that medical care would have saved Josh's life, but maintains that the delay in providing medical treatment caused unnecessary pain in the last moments of his life.

The Fourteenth Amendment provides pretrial detainees with the same protection against denial of medical attention as that afforded to inmates under the Eighth Amendment. *Estate of Hocker v. Walsh*, 22 F.3d 995, 998; *Garcia v. Salt Lake County*, 768 F.2d 303, 307 (10th Cir. 1985). Plaintiff's claim for failure to provide medical care must be evaluated under the "deliberate indifference to serious medical needs" test found in *Estelle v. Gamble*, 429 U.S. 97 (1976). *Id.*

The *Estelle* test "involves both an objective and a subjective component." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (citing *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). As to the objective component, Plaintiff must show that Josh's medical need was in fact "sufficiently serious." A medical need is sufficiently serious if it is one "that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* Defendants do not dispute this. The subjective component requires Plaintiff to show the officers' culpable state of mind. *Id.* (citing *Estelle*, 429 U.S. at 106). "The subjective component is satisfied if the official 'knows of and disregards an excessive risk to inmate health or safety; the official must

both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference.'" *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  Plaintiff has not made such a showing.

Plaintiff's claims based on the officers' failure to provide medical aid to Josh, including checking his vital signs or performing CPR, fail.  Plaintiff herself points out that post-shooting video shows a massive gunshot wound to the back of Josh's head and that in the video he can be heard gasping for air.  Still, Plaintiff has presented no evidence that any of the officers could have or thought they could have done anything to help Josh or ease his pain in his condition. Moreover, the officers' first duty was to secure the scene to ensure the safety of the officers, EMS personnel and others.  *Wilson v. Meeks*, 52 F.3d 1547, 1556 (10th Cir. 1995) (*abrogated on other grounds by Saucier v. Katz*, 533 U.S. 194 (2001)).

Plaintiff's claims based on the officers' preventing the EMS personnel on the scene from providing care for Josh for a period of 12 minutes also fail.  Within seconds of the shooting, Officer Felts radioed that shots had been fired and EMS was needed.  Then each of the officers on the scene, including Officers Tanner, McNiel, and Felts, and each of the marshals on the scene, including Marshal Buhl, worked together to secure the scene.  Josh had moved back and forth between the north and south openings of the attic.  None of the officers or marshals knew if there was another person in the attic with a gun.  Another person in the attic with a gun could have posed a serious threat to the officers and EMS personnel.  Plaintiff has not presented evidence that the officers should have known there was no one else in the attic.

Marshal Buhl made the decision to hold EMS from the scene until the attic could be cleared.  The safest way to clear the attic was with a pole camera.  When a pole camera could not be found, Marshal Buhl and another Cherokee Marshal went into the attic and cleared it.  Once it

was cleared, Officer Felts escorted several EMS personnel to Josh.  Plaintiff has not presented any evidence that these decisions, or the adherence thereto by the other officers on the scene, were unreasonable.

Plaintiff has not shown that Officer Tanner, Officer McNiel, Officer Felts, or Marshal Buhl unreasonably denied or delayed medical care or were deliberately indifferent to his serious medical needs.  None of the officers violated Josh's constitutional rights.

As to the second prong of the qualified immunity analysis, Plaintiff again has not met her burden.  Citing *Estate of Booker*, Plaintiff argues that any reasonable officer would have known to check Josh's vital signs, perform CPR or seek medical care.  That Court held that "any reasonable officer in the Defendants' position (and with their training) would have known that failing to check *Mr. Booker's* vital signs, perform CPR, or seek medical care for three minutes when he was limp and unconscious as a result of the Defendants' use of force could violate the Constitution." *Estate of Booker*, 745 F.3d at 434 (emphasis added).  That case, however, was very different than the one now before the court.  In that case, Mr. Booker had been subjected to "an eight second taser cycle after he had been placed in a carotid neck hold for over two minutes while in a prone position." *Id.* at 432.  In the case at bar, Josh had been shot in the head after a standoff with several officers.  The officers had to secure the scene before they could allow EMS personnel to enter.  Plaintiff has brought forth and the court knows of no Supreme Court or Tenth Circuit decision holding that under the circumstances of this case, the officers should have ignored their safety procedure training and rushed to give Josh medical assistance or allow EMS personnel on the scene before it was secured.

None of the officers – Officer Tanner, Officer McNiel, Officer Felts, or Marshal Buhl – violated Josh's Fourteenth Amendment rights.  Moreover, they have each asserted qualified

immunity, and Plaintiff has failed to meet her burden to show that any of them violated a constitutional right or that the constitutional right was clearly established at the time of the alleged violation. Summary judgment, therefore, is granted as to these claims.

**C.   § 1983 Claims – City of Tahlequah**

Plaintiff's first and second causes of action – her claims of excessive force and failure to provide medical care – are also against the City. To prevail on these claims against the City, Plaintiff must establish that: (1) a City officer violated Josh's constitutional rights; and (2) there is a direct causal link between a City policy or custom and the alleged constitutional deprivation. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). As the court has already held, Plaintiff has not established that any of the City's officers violated Josh's constitutional rights. Moreover, Plaintiff has presented no evidence of any City policy or custom that would have led to the alleged constitutional violations.[31] Summary judgment is granted as to these claims.

**V.     STATE LAW CLAIMS**

Plaintiff brings OGTCA claims against the City for assault and battery, excessive force, and negligent failure to provide medical assistance. As the federal claims have been dismissed, the court declines to exercise supplemental jurisdiction over these state law claims. "Section 1367(c) provides conditions where district courts may decline to exercise supplemental jurisdiction, and the Supreme Court repeatedly has determined that supplemental jurisdiction is

---

[31]     Plaintiff's references to two unrelated claims filed by others against the City and settled for undisclosed amounts do not establish a genuine issue of material fact with regard to a practice, policy or custom of excessive force by the TPD.

not a matter of the litigants' right, but of judicial discretion."[32]  <u>Estate of Harshman v. Jackson</u>

<u>Hole Mountain Resort Corp.</u>, 379 F.3d 1161, 1165 (10th Cir. 2004) (citations omitted).

The Tenth Circuit has stated, "[w]hen all federal claims have been dismissed, the court

may, *and usually should*, decline to exercise jurisdiction over any remaining state claims."

<u>Smith v. City of Enid</u>, 149 F.3d 1151, 1156 (10th Cir. 1998) (citing 28 U.S.C. § 1367(c))

(emphasis added).  "Certainly, if the federal claims are dismissed before trial, even though not

insubstantial in a jurisdictional sense, the state claims should be dismissed as well."  <u>United</u>

<u>Mine Workers v. Gibbs</u>, 383 U.S. 715, 726 (1966).  As the court declines to exercise jurisdiction

over the remaining state law claims, those claims are hereby dismissed.


## VI.    CONCLUSION

For the reasons stated above, Plaintiff's motion for sanctions for spoliation of evidence

[Docket No. 64] is hereby DENIED.  The motion for summary judgment filed by the City of

Tahlequah [Docket No 60] is hereby GRANTED IN PART.  It is GRANTED as to the § 1983

claims.  The court declines to exercise jurisdiction over the remaining state law claims; thus,

those claims are dismissed.

The motion for summary judgment filed by Randy Tanner [Docket No. 58] is

GRANTED.  The motion for summary judgment filed by Bronson McNiel [Docket No. 59] is

---

[32]      The court may decline to exercise supplemental jurisdiction when:
(1) the claim raises a novel or complex issue of State law,
(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
(3) the district court has dismissed all claims over which it has original jurisdiction, or
(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.
28 U.S.C.A. § 1367.

GRANTED.  The motion for summary judgment filed by Shannon Buhl [Docket No. 61] is

GRANTED.  The motion for summary judgment filed by Reed Felts [Docket No. 62] is

GRANTED.

**IT IS SO ORDERED** this 25th day of June, 2018.

_Ronald A. White_

_____
**THE HONORABLE RONALD A. WHITE**
**UNITED STATES DISTRICT JUDGE**
**EASTERN DISTRICT OF OKLAHOMA**